**In re CALIFORNIA EASTERN AIRWAYS, Inc.**

No. 1462.

United States District Court,
D. Delaware.

May 18, 1951.

Arthur G. Logan and Samuel R. Russell (of Logan, Marvel & Boggs), of Wilmington, Del., for petitioners.

848

James E. Hughes and George F. Mason, Jr., (of Coudert Brothers), of New York City, and David F. Anderson (of Southerland, Berl & Potter), of Wilmington, Del., for debtor.

LEAHY, Chief Judge.

Edward A. Kerbs and George J. Haney, by petition, have moved this court to punish the California Eastern Airways, Inc., hereinafter referred to as the Debtor, for contempt of court for violation of the terms of an order of this court dated May 13, 1948. The facts upon which the petitioners rely as constituting the contempt are:

On May 12, 1948, Debtor filed a petition in this court proposing an arrangement with its unsecured creditors under the provisions of Chapter XI of the Bankruptcy Act.[1] By order of this court, dated May 13, 1948, it was provided until further order that Debtor should continue in possession of its property with all the title and exercising all the powers of a Trustee appointed under the Bankruptcy Act and with the power to operate the business and manage the corporate property subject at all times to the control of this court. The proposed arrangement was subsequently modified by leave of court and the Modified Plan of Arrangement accepted in writing by a majority in number of all creditors of each class affected by the arrangement. On June 30, 1949, the Modified Plan was confirmed

by order of this court with a provision that this court retain jurisdiction over the Debtor and all its properties until all provisions of the Modified Plan were performed. Certain provisions of the May 13, 1948 order were to be continued in full force and effect until further order.[2] On December 7, 1950, an order was entered by the terms of which Debtor was discharged and the arrangement proceedings closed.[3] During the period May 13, 1948 to December 7, 1950, and pursuant to the order of May 13, 1948, Debtor petitioned the court for approval when it sought to transact any corporate business of major importance or to dispose of corporate property but with one exception.

It is this exception which is the basis for the present petition. On April 28, 1950, the directors of Debtor adopted an incentive profit-sharing plan whereby a certain percentage of profits was to be allocated among executives of Debtor by the directors. The plan provided that the basis for determining profits would be calculated after depreciation, but before interest was paid to unsecured creditors under the Plan of Arrangement and before the payment of income taxes. On October 24, 1950, this plan was rescinded by the directors and a new plan adopted which, in effect, accelerated and increased payments of profits to the executives and retained the same basis for the determination of profits. The first

1. 11 U.S.C.A. ch. XI, §§ 701–799.

2. "It Is * * * Further Ordered, that this Court hereby retains jurisdiction over the Debtor and all its properties until all provisions of the Modified Plan of Arrangement have been performed and the Order of this Court dated May 13, 1948 enjoining all creditors and stockholders, and all sheriffs, marshals and other officers and their respective attorneys, agents, servants and employees, and all other persons, firms and corporations from instituting or prosecuting any action at law or suit or proceeding in equity against the Debtor in any court; and from executing or issuing or causing to be executed or issued out of any court, any writ, process, summons, attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of, or interfering with, any prop-

erty owned by or in the possession of the Debtor and from removing, transferring, disposing of or interfering with, or in any way attempting to remove, transfer or dispose of or interfere with any property, assets or effects owned by or in possession of the Debtor, or of any officer, agent or employee of the Debtor, and from doing any act or thing whatsoever to interfere with the possession and management by the Debtor of its property and assets, is hereby continued in full force and effect until further Order of this Court."

3. The order recited the fact that all debts scheduled by the Debtor or proved and allowed in the proceeding had been paid in full by the Debtor, together with interest at the rate of six per cent per annum from the date of accrual of each such debt.

distribution of funds under the October 24, 1950, profit-sharing plan was made on November 21, 1950, after approval of the Executive Committee of Debtor.[4] Neither the profit-sharing plans nor the payment of the sum referred to above were submitted to this court for its approval. One further fact which is crucial to the Debtor's argument here in opposition to the plaintiffs' petition must be noted. The Modified Plan of Arrangement had been fully performed and all creditors paid off in full with interest at six per cent by November 6, 1950.[5]

Petitioners allege as a result of the adoption of the profit-sharing plan and the payment thereunder, the corporation has suffered a great loss of assets to the detriment of the corporation and the stockholders thereof. Petitioners further allege the adoption of the profit-sharing plan and the payment thereunder were willful violations of the order of this court entered in these proceedings on May 13, 1948, and constitute a contempt of this court.

1. As to the payment under the profit-sharing plan, petitioners argue that by the terms of the order of June 30, 1949, this court did not lose its exclusive jurisdiction as provided in 11 U.S.C.A. § 711 and as stated in the third paragraph[6] of its order of May 13, 1948, until Debtor was discharged, i. e., when the proceedings were dismissed on December 7, 1950. Petitioners argue further the order of June 30, 1949, continued the order of May 13, 1948, in full force and effect so that all matters in reference to the operation and management of the business were subject to the control of the court until Debtor was finally discharged. A reading of the applicable paragraph of the June 30, 1949 order (quoted above, n. 2), however, shows jurisdiction by this court was retained only until the provisions of the Modified Plan had been performed and that the order of May 13, 1948, was only continued in full force and effect as to certain provisions of that order.[7]

■ From a reading of the June 30, 1949 and May 13, 1948 orders, there is no doubt in my mind this court retained jurisdiction of Debtor until the provisions of the arrangement had been performed and upon the performance of all of the provisions of the Modified Plan the jurisdiction of the court ceased.[8] Petitioners do

4. Under the provisions of the profit-sharing plan, the petitioners allege that the Debtor paid to eleven officers, directors and employees of the Debtor the total sum of $26,249.25. The Debtor does not in its answer to the petition deny the payment nor the specific amount of $26,249.25. The Debtor's financial statement of November 30, 1950, however, shows a total payment of $23,582.27 under the profit-sharing plan. In view of my determination of the present petition, the exact sum paid under the plan is immaterial.

5. See n. 3, supra.

6. "Ordered, that until the further order of the Court the debtor shall continue in possession of its property, with all the title and exercising all the powers of a Trustee appointed under the Bankruptcy Act; and the debtor shall have the power during such period to operate the business and manage the property of the debtor, such possession and such operation of the business to be, however, at all times subject to the control of the Court; and the debtor shall file a report of its management and operations pursuant to this order on or before the first meeting of creditors hereinafter set forth; * * *."

7. The substance of the paragraph of the June 30, 1949 order, quoted in n. 2 above, referring to the May 13, 1948 order, was contained in a paragraph of the May 13, 1948 order which was separate and distinct from the paragraph of that order which subjected the possession of the Debtor and operation and management of the Debtor's business to the control of this court. Cf. the language of the orders found in notes 2 and 6.

8. Federal Bankruptcy Act, §§ 357(7) and 368, 11 U.S.C.A. §§ 757(7) and 768; 8 Collier on Bankruptcy, 14th Ed., 1941, 1083–1086, 1244–1247; Seedman v. Friedman, 2 Cir., 132 F.2d 290, 294–295; In re Gelardin, Inc., D.C.E.D.N.Y., 41 F.Supp. 17. Petitioners seek to distinguish the Seedman and Gelardin cases on the ground that in neither of those cases did the order of confirmation contain a provision for continuing the court's control of the Debtor and its properties, as is contained in the order of this court of June 30, 1949, by reference to the order of May 13, 1948. The answer to petitioners' contention is

not dispute that complete performance of the provisions of the Modified Plan took place on November 6, 1950, the date upon which Debtor made full payment of all claims affected by the Modified Plan of arrangement. The court subsequent to November 6, 1950 no longer had jurisdiction over Debtor and its properties, except for certain limited purposes, such as allowing or disallowing disputed claims or fixing compensation to attorneys or accountants serving Debtor during the Arrangement Proceeding.[9] While the order of the court dated December 7, 1950 by its terms dismisses the action, except for the purpose of the allowance or disallowance of claims, the *effect* of this order is *to confirm* the fact that the operation of the business and the management of the property of *Debtor is no longer subject to the control* of the court, rather than by its own force releasing such operation and management from court control. While it is sound procedure for the court by such an order to confirm the status of the proceedings, it is clear under the provisions of Chapter XI the jurisdiction of the court to control the operation of the business and the management of the property of Debtor is lost immediately upon the performance by Debtor of all of the provisions of the arrangement.[10] The payment under the profit-sharing plan was made subsequent to November 6, 1950.

> that they infer a much broader meaning to the language continuing the May 13, 1948 order than is warranted by the language used, for, as I have previously stated, the May 13, 1948 order was only continued in a limited degree, namely, to the extent of preventing litigation and interference by creditors and stockholders until further order of this court. The provision of the May 13, 1948 order referring to control by the court of the Debtor was not included in the June 30, 1949 order. This court's retention of jurisdiction was not one of control over the subsequent acts of the Debtor but was for the purpose of seeing that the Modified Plan of Arrangement would be carried out. See Seedman v. Friedman, supra, 132 F.2d at page 295, where the court's function in such a situation as this was described by Judge Clark to be "essentially one of, at most, watchful waiting."

It is true as petitioners argue that on numerous occasions when Debtor sought approval for some of its actions from this court, Debtor recited in its petitions that its action was taken "subject to the approval of this court." On this basis the petitioners assert that Debtor should not be allowed, now, to repudiate its former position that at all times its activities were subject to the control of the court. Even though Debtor may have thought this court had jurisdiction, if in fact this court did not have jurisdiction over all the acts of the Debtor but only jurisdiction as limited by its policy of "watchful waiting", the mere belief of Debtor and its acts in reliance on that belief would not be sufficient to confer jurisdiction on this court where otherwise it would not have jurisdiction.[11]

2. As to the adoption of the profit-sharing plans, petitioners submit that the mere adoption of the profit-sharing plans on April 28, 1950 and October 24, 1950 by Debtor's officers and directors constituted contempts of this court because they violated the terms of the order of May 13, 1948. The adoption of the profit-sharing plans, however, took place after the order of June 30, 1949, confirming the arrangement plan. Debtor argues that, except to the extent that the operation or conduct of the business of the corporation is made subject to the control of the court, the

9. See 11 U.S.C.A. §§ 769, 771; General Orders in Bankruptcy Nos. 42, 44 and 45, 11 U.S.C.A. following section 53.

10. See § 357, Federal Bankruptcy Act, 11 U.S.C.A. § 757.

11. "It needs no citation of authorities to show that the mere consent of parties cannot confer upon a court of the United States the jurisdiction to hear and decide a case. If this were once conceded, the Federal courts would become the common resort of persons who have no right, either under the Constitution or the laws of the United States, to litigate in those courts." *People's Bank of Belville v. Calhoun*, 102 U.S. 256, 260–261, 26 L.Ed. 101, quoted by the Court in *American Fire and Casualty Co. v. Finn*, 341 U.S. 6, 18, n. 17, 71 S.Ct. 534, 542.

powers of the Board of Directors and stockholders of the corporation are unaltered in Chapter XI proceedings. In re J. P. Linahan, Inc., 2 Cir., 111 F.2d 590, 592. While Debtor concedes the directors of the corporation are prohibited from disbursing the assets of the corporation, other than as permitted by the Act or by the court having jurisdiction of the arrangement proceedings, it submits the directors and shareholders during the pendency of the proceeding have the full power to accomplish any corporate purposes otherwise legal. It is further argued by Debtor that though it might be impossible for the corporation to implement such purposes, without court approval, while the corporation remains under the jurisdiction of the court, this fact does not in any way prevent the directors from adopting resolutions which would be put into force and acted upon subsequent to the termination of control over Debtor although the proceedings under the Bankruptcy Act may still continue for the purposes of determining disputed creditors' claims. I am forced to agree with Debtor's position here, mainly because no action was taken to implement the corporate resolutions until after November 6, 1950, at which time the jurisdiction of this court ceased.[12] Petitioners point out that Debtor did *set aside from current earnings certain sums during the period of May 1, 1950 and October 1, 1950,* in order to be able to make payments under the plan, although during the same period Debtor sought and obtained the approval of this court to borrow $65,000.00 at 5% interest as part of the court's supervisory jurisdiction under Chapter XI. Regardless of my view as to the propriety of Debtor's action here, of adopting a profit-sharing scheme without first seeking the court's approval, the fact still remains that no payment was made under the plan until after November 6, 1950.

3. Lest it be construed by my conclusion that the present petition to hold Debtor in contempt must be denied, that I countenance the action of Debtor here and especially the manner in which it has acted, I desire to set forth for the record my personal view of Debtor's conduct which has given rise to the instant petition. Between June 30, 1949 and November 6, 1950, the Debtor petitioned this court repeatedly for approval of its transactions, transactions which affected varying facets of Debtor's business.[13] On at least seven occasions,

12. It is true as petitioners assert that the profit-sharing plans apparently were to be put into force and effect immediately upon passage. Both plans provided: "The computation of profits will be made with respect to each Calendar Quarter commencing with the Quarter beginning April 1, 1950, and payment will be made upon the expiration of each such quarter". It is still true, however, that no moneys were actually disbursed until after November 6, 1950. Any attack on the validity of the profit-sharing plans and the directors' power to adopt such plans is more properly a subject of internal corporate activities. The petitioners have recourse to a representative suit to attack the plan and such an attack should not be allowed as an ancillary matter in a contempt proceeding. It may be noted that the present petitioners, on December 12, 1950, instituted a representative suit in the Court of Chancery of Delaware attacking the profit-sharing plan as a device for the distribution of corporate funds without consideration. A trial was had before Chancellor Wolcott in March 1951. At the time of the filing of my opinion here, the Chancellor had not yet announced his decision on the legality of the plan. I wish to make clear that I am not expressing any opinion in this contempt proceeding as to the validity or illegality of the plan now under attack before Chancellor Wolcott.

13. June 30, 1949, extension agreement affecting the indebtedness owed to the Shell Oil Company and the mortgage standing as security therefor; August 15, 1949, action of Board of Directors of Debtor in filing an application with Civil Aeronautics Board for a certificate of public convenience and necessity and hiring an expert at a salary of $150.00 a week plus expenses to prepare exhibits required by the CAB; *November 25, 1949, retention of counsel before CAB; *December 28, 1949, increase of salaries of certain officers of the Debtor; January 20, 1950, borrowing of $35,000.00 at 5% interest to be used for purpose of converting one of the Debtor's aircraft from Type A to Type B; *April 21, 1950, objections to certain claims; *June 16, 1950, objections to certain

Debtor in its petitions to the court recited Debtor's business was subject to the control of this court.[14] The court's function after the order of June 30, 1949, was only one of "watchful waiting",[15] and Debtor need not have petitioned this court for approval of any of its actions relating to the operation of the business. Debtor, however, did come to the court seeking its judicial imprimatur on matters affecting the operation of the business in many instances but did not do so when it adopted its profit-sharing plan for the benefit of its officers, etc. Debtor, moreover, in its petition to the court on December 28, 1949, seeking approval of salary increases for certain officers, specifically stated that the Executive Committee of Debtor's Board of Directors "intended to recommend *at some later date* a profit sharing and stock purchase plan under which certain executives of the corporation would share in the profits of the corporation above a certain figure, and would be permitted to purchase equity securities of the corporation, but that it would submit recommendations with respect to these matters at a later meeting of the Board of Directors." (Emphasis supplied.) Debtor, furthermore, in seeking approval on July 17, 1950 to borrow $65,000.00 made no disclosure to the court that it had adopted a profit-sharing plan, though the plan of April 28, 1950, had already been approved by its Board of Directors. Counsel for Debtor in a hearing before me on December 22, 1950,[16] a month *after* Debtor had made a payment under the October 24,

1950 plan, said in reference to the plan, "May I make this one point clear? Mr. Logan is representing a group of stockholders, at least two of which are complainants in an action in the Court of Chancery. They disagree with certain things that the management wants to do. I say 'wants to do' not 'did'." And, again, in the same hearing, Debtor's counsel stated to me, "The action that Mr. Logan is complaining about took place all after your Honor's order [of December 7, 1950, dismissing the action] was entered." The plain inference to be drawn from these remarks was that Debtor had never taken any action on its profit-sharing plan.

The Debtor's lack of frankness in regard to its profit-sharing plan contrasts sharply with the candor shown by it and its counsel in all the other matters that have come before me in this proceeding. Though I have concluded that Debtor's conduct was not contumacious in the matter at bar because action on the plan (i. e., actual payment under a pre-conceived plan adopted and approved without court knowledge) was taken only after my jurisdiction had ceased, it certainly was conduct which will require me to examine further Chapter XI proceedings with sharper vision. Though no one in the instant case has been harmed by Debtor's acts,[17] that fact does not lessen standards of disclosure which this court requires and which, in the case of counsel who are admitted to practice *pro hac vice,* this court has become accustomed to expect.

No contempt will issue.

claims; *June 26, 1950, approval of compromises of certain claims; July 17, 1950, borrowing of $65,000.00 to purchase equipment necessary for operations; *August 1, 1950, approval of contract with the Department of the Air Force of the United States; *September 15, 1950, approval of compromise of claim.

14. Such a recital was contained in each of the petitions marked with an asterisk in n. 13 supra.

15. Seedman v. Friedman, supra, n. 8.

16. The hearing was on an application for fees. Mr. Logan, counsel for petitioners here, appeared then to ask that nothing

be done and nothing construed to affect adversely the proceedings filed in the Delaware Court of Chancery on December 12, 1950 attacking the proposed plan. Mr. Logan at that time, like the court, had no knowledge that Debtor's plan had actually been put into effect.

17. That is to say, all creditors have been paid in full and the present petitioners representing the stockholders of Debtor have the opportunity of proving the adoption of the plan to be of harm to them in their Court of Chancery action and securing appropriate relief in that Court.